IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THE MONEY SOURCE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 18-0151-WS-B |
| | ) | |
| PAYMAP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter comes before the Court on plaintiff's Motion for Summary Judgment (doc. 108), defendant's Motion for Summary Judgment (doc. 110), and plaintiff's Motion to Strike (doc. 117). All three Motions have been briefed and are ripe for disposition at this time.

**I.     Nature of the Case.**

In 2015 and 2016, errors occurred in the routing of a series of payments made by Anastasia Diehl on her residential mortgage loan. Even though Diehl was current on her mortgage and caused all payments to be submitted in a timely fashion, her loan servicer did not receive several of them because of these errors. The servicer declared the loan to be delinquent and initiated aggressive collection efforts. In response, Diehl filed two separate lawsuits in this District Court against the servicer and others for their alleged roles in the mishandling of her mortgage payments and/or the ensuing collection activities, to-wit: *Anastasia P. Diehl v. The Money Source Inc., et al.*, Civil Action No. 17-0125-TFM-B (the "*Money Source* Action"), and *Anastasia P. Diehl v. Paymap, Inc.*, Civil Action No. 18-0017-WS-B (the "*Paymap* Action"). Both the *Money Source* Action and the *Paymap* Action concluded via settlement.

In the case at bar, a key defendant in the *Money Source* Action seeks to recover damages from the named defendant in the *Paymap* Action. Specifically, The Money Source Inc. ("TMS"), the entity that serviced Diehl's mortgage loan at relevant times and ultimately commenced collection efforts against her, filed suit against Paymap, Inc. ("Paymap"), the entity that directly collected the subject funds from Diehl and routed them to a third entity, nonparty

LoanCare, LLC ("LoanCare").  In its Second Amended Complaint, TMS asserts state-law causes of action against Paymap for breach of contract (Count One), money had and received (Count Four), failure to indemnify (Count Five), and unjust enrichment (Count Six).[1]  TMS claims as damages the harm to its customer/servicer relationship with Diehl, the legal fees it incurred in defending itself and LoanCare (which it indemnified) in the *Money Source* Action, the payments it made to settle the *Money Source* Action, the legal fees it has incurred in prosecuting this case, and punitive damages.  Correctly recognizing that the vast majority of the material facts are undisputed,[2] both sides have now moved for summary judgment on all claims and issues joined in this action.

## II.   Relevant Background Facts.[3]

### A.   *Diehl's Mortgage Loan.*

On or about April 15, 2014, Anastasia Diehl entered into a residential loan agreement with nonparty Home Mortgage of America, Inc., in connection with the purchase of her home in Mobile, Alabama.  (Doc. 109-1, ¶¶ 7-8, PageID.859-60.)  On May 27, 2014, servicing of Diehl's

---

[1]   Federal subject-matter jurisdiction is properly predicated on the diversity provisions of 28 U.S.C. § 1332, inasmuch as TMS (a New York corporation with its principal place of business in New York) and Paymap (a Delaware corporation with its principal place of business in Colorado) are of diverse citizenship, and the amount in controversy is well in excess of the $75,000 jurisdictional threshold.

[2]   As TMS observes in one of its briefs, "At the heart of the matter, the relevant material facts are not in dispute."  (Doc. 123, PageID.1550.)  The Court agrees.

[3]   The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment …. Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted).  As to each cross-motion for summary judgment, then, the record will be viewed in the light most favorable to the non-movant, with all justifiable inferences drawn in the non-movant's favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [each non-movant]'s version of the facts drawing all justifiable inferences in [each non-movant]'s favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

loan was transferred from plaintiff TMS to LoanCare, such that LoanCare began sub-servicing the loan on behalf of TMS as of that date. (*Id.*, ¶ 11, PageID.860.) This arrangement remained in place until August 3, 2015, when servicing of Diehl's loan was transferred back from LoanCare to TMS. (*Id.*, ¶ 13.) LoanCare sent a letter to Diehl on July 17, 2015, notifying her of the servicing transfer of her loan back to TMS. (*Id.*, ¶ 12.) Diehl was current on her loan payments at that time. (*Id.*, ¶ 14; doc. 109-7, ¶¶ 12-13, PageID.1288.)

In December 2014, while her loan was still being serviced by LoanCare, Diehl enrolled in a product called the "Equity Accelerator Program" ("EAP") to facilitate and automate her mortgage payments. (Doc. 107, ¶ 25, PageID.770.)[4] The EAP was marketed to Diehl as a "convenient payment system [that] will electronically debit the checking or savings account of your choice for a portion of your loan payment every other Friday. These funds are then applied to pay your mortgage based on your due date each month." (Doc. 107-1, Exh. J, PageID.834.) The EAP program was administered by defendant Paymap, pursuant to a contractual arrangement with LoanCare. (Doc. 107, ¶ 7, PageID.766.) By enrolling in the program, Diehl authorized "LoanCare or its authorized representatives and service providers [*i.e.*, Paymap] to initiate transfers from [her] designated account to make monthly payments to [her] mortgage." (Doc. 107-1, Exh. J, PageID.832.) In other words, Paymap was to withdraw and distribute Diehl's mortgage payments from her bank account automatically. There was no direct contractual relationship between Paymap and TMS at any time.

---

[4] This record citation is to the Declaration of Adriana Maria Cubero Loria (the "Cubero Declaration") that Paymap submitted in support of its Motion for Summary Judgment. TMS has filed a Motion to Strike (doc. 117) directed at two specific aspects of the Cubero Declaration. First, TMS objects to the Cubero Declaration's description of Paymap's contractual duties for LoanCare as to the EAP as constituting a "back office" arrangement. TMS posits that such a characterization is "outside of the four corners of the Paymap / LoanCare agreement." (Doc. 117, ¶ 3.) Second, TMS seeks to strike what it describes as a "legal analysis" in the Cubero Declaration concerning the Paymap / LoanCare agreement and LoanCare's compliance (or lack thereof) with same. (Doc. 117, ¶¶ 5-7.) These objections do not appear meritorious, as the Court perceives nothing improper in the cited portions of the Cubero Declaration. Nonetheless, because the legal issues presented on summary judgment do not hinge on Cubero's framing of the Paymap / LoanCare relationship or on any legal opinions that may have been offered in her Declaration, the Court need not – and does not – adjudicate the Motion to Strike in order to resolve the cross-motions for summary judgment in their entirety.

**B.     *The Mishandled Mortgage Payments.***

There were no issues or problems with Diehl's mortgage payments or her participation in the EAP program between December 2014 (when she enrolled) and August 3, 2015 (when servicing of her loan transferred from LoanCare back to TMS).  Upon being notified of the servicing transfer, Diehl called Paymap (as administrators of the EAP) on or about August 14, 2015 to inform them that the servicing of her loan was being transferred to TMS.  (Doc. 109-3, PageID.1256; doc. 109-4, PageID.1272-74.)  On or about September 23, 2015, Diehl followed up with Paymap by providing them with TMS's contact information, as well as a copy of the servicing transfer letter.  (Doc. 109-3, PageID.1257; doc. 109-4, PageID.1274.)  And on February 1, 2016, Diehl held a joint telephone conference with representatives from both TMS and Paymap, at which time the participants discussed the fact that TMS had never received certain mortgage payments, even though the funds had been debited from Diehl's account pursuant to the EAP program.  (doc. 109-1, PageID.901-02.)  During that call, the Paymap representative indicated that Paymap would update the payment process address to that of TMS. (Doc. 109-1, PageID.902.)  There is no record evidence that LoanCare ever directly notified Paymap of the August 2015 servicing transfer of Diehl's loan from LoanCare to TMS.  (Doc. 107, ¶ 17, PageID.769.)[5]

As a consequence of the servicing transfer in August 2015, Diehl's mortgage payments should have ultimately been remitted to TMS, the new servicer of her loan, rather than to LoanCare, the previous sub-servicer of Diehl's loan.  Unfortunately, that is not what happened. Paymap sent Diehl's mortgage payments for August 2015, September 2015, October 2015, November 2015, December 2015, January 2016 and April 2016 to LoanCare.  (Doc. 109-7, ¶ 21, PageID.1289.)  LoanCare did not immediately (or, in some cases, ever) forward these payments to TMS.  The January 2016 and April 2016 payments are critical to TMS's claims in this action,

---

[5]     In contesting this point, TMS cites a Paymap representative's deposition testimony expressing an understanding that "Loan Care [*sic*] sends reports to [Paymap] of loans being transferred."  (Doc. 109-3, PageID.1164.)  But nothing in the cited testimony or elsewhere in TMS's record evidence supports a reasonable inference that LoanCare specifically and directly notified Paymap of the transfer of Diehl's loan to TMS in the manner and form required by the LoanCare / Paymap agreement.  Certainly, no specific report from LoanCare to Paymap documenting such a transfer of Diehl's loan to TMS has been included in the record on summary judgment, and no witness has testified to the existence of such a report.

and to Diehl's claims asserted in the *Money Source* and *Paymap* Actions. (Doc. 57, ¶ 4, PageID.240.) TMS indicates that it "has never received a monthly payment for the months of January 2016 and April 2016 on Ms. Diehl's loan." (Doc. 109-1, ¶ 18, PageID.861.) Moreover, record evidence shows that Paymap refunded Diehl's January 2016 and April 2016 payments to her, even though it had already remitted those January 2016 and April 2016 payments to LoanCare. (Doc. 107, ¶¶ 30-31, PageID.771-72; doc. 107-1, ¶¶ 21-25, PageID.820; doc. 122-1, PageID.1543-44.) Those particular missed payments never received by TMS led to TMS deeming Diehl to be delinquent on her loan. (Doc. 109-1, ¶ 23, PageID.862.) Accordingly, TMS initiated collections activity against Diehl, which in turn set off a chain of events culminating in Diehl filing suit against TMS and LoanCare in the *Money Source* Action. After nearly 26 months of litigation in this District Court, the parties settled the *Money Source* Action, with TMS making certain payments to Diehl and her counsel. TMS indemnified LoanCare in the *Money Source* Action pursuant to a contractual indemnification provision in the TMS / LoanCare servicing agreement, and paid LoanCare's legal fees and costs in the *Money Source* Action. (*Id.*, ¶ 27, PageID.862.) Now TMS seeks to recover from Paymap for (i) damages to its customer/servicer relationship with Diehl; (ii) legal fees and costs incurred in defending itself and LoanCare in the *Money Source* Action; (iii) the settlement value paid to Diehl in the *Money Source* Action; and (iv) TMS's legal fees and costs incurred in prosecuting the case at bar against Paymap. (*Id.*, ¶ 28, PageID.862.)[6] Thus, in substantial part, this case is an attempt by TMS to recoup from Paymap the attorney's fees it paid in the underlying litigation.

### C.     The Agreement Between Paymap and LoanCare.

All parties agree that there is, and was, no direct contractual relationship between TMS and Paymap. Instead, TMS maintains that Paymap owed it certain contractual duties pursuant to the Equity Accelerator Service Agreement (the "Agreement") between Paymap and LoanCare. TMS's stance is that it is a third-party beneficiary of the Agreement. As such, the terms of that Agreement are of critical importance to the claims and issues joined in this action.

---

[6]     In support of its summary judgment motion, TMS provided an itemization of claimed damages and supporting documentation reflecting that (as of December 1, 2019) TMS seeks to recover from Paymap the sum of $474,997.63, constituting attorney's fees and settlement payments made in the *Money Source* Action, plus the sum of $107,209.50, constituting attorney's fees accrued by TMS in prosecuting this action, for a total of $582,207.13 in claimed damages. (Doc. 111, PageID.1436.)

In Paragraph 2 of the Agreement, Paymap agreed to "provide the payment processing service and related activities" for the EAP "for use by Customers [of LoanCare]." (Doc. 107-1, ¶ 2, PageID.777.) The services Paymap was contractually bound to provide included "Process[ing] on-going debits from Subscriber accounts to the CHA," where the "CHA" is a custodial holding account that LoanCare was required to "open and maintain in its name at [LoanCare's] location or its correspondent bank." (Doc. 107-1, Schedule A, ¶¶ 1(c), 2(c)(7).) Paymap was further required under the Agreement to "Process monthly mortgage payments from the CHA to Client or a transferee designated by Client." (*Id.*, ¶ 2(c)(8).) Paragraph 11 of the Agreement specifically provided for certain procedures and notifications in the event of a loan servicing transfer by LoanCare to a third party, as follows:

> "If [LoanCare] shall determine to sell or otherwise transfer the loans that are the subject of Subscriber Contracts, [LoanCare] shall notify Paymap of its intention to do so at least 15 days prior to the proposed transfer or sale and provide Paymap with the name of the transferee and other pertinent details necessary for Paymap to accomplish an orderly transition to the transferee. …Upon sale or transfer, this Agreement shall remain in effect …, and [LoanCare] shall assist Paymap in implementing a process to make payments through [LoanCare] to the transferee. Transfer of the Subscriber's loan shall not affect the Subscriber Contract."

(Doc. 107-1, ¶ 11, PageID.778.) A "Subscriber" is a borrower whose loan is being serviced by LoanCare and who enrolls in the EAP service, and a "Subscriber Contract" is simply the agreement pursuant to which a LoanCare customer enrolls in the EAP service. As to the form of the notice required in Paragraph 11, Paragraph 14 of the Agreement specified that "[a]ll notices required to be given under this Agreement shall be in writing and shall be deemed given if sent and delivered by facsimile and confirmed by overnight courier addressed to each party …. Notice sent to Paymap shall be directed to its President …." (*Id.*, ¶ 14.)

Three other provisions of the Agreement are relevant to the pending Motions for Summary Judgment. First, Paragraph 6 was an indemnification clause, providing in pertinent part as follows: "Paymap agrees to indemnify and hold harmless [LoanCare] and its agents, employees, officers, directors, affiliates, subsidiaries, successors and assigns from and against all third party claims resulting solely from Paymap's breach of this Agreement." (*Id.*, ¶ 6.) Second, Paragraph 15 limited LoanCare's ability to assign the Agreement to third parties, to-wit: "[LoanCare] may not assign or otherwise transfer its rights and obligations pursuant to this Agreement without Paymap's prior written consent." (*Id.*, ¶ 15.) And third, Paragraph 13

reflected that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without regard to the conflicts of laws principles thereof." (*Id.*, ¶ 13.)

## III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Here, both sides have moved for summary judgment on the claims asserted in this action. It is well-settled that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same).  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the

merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307.  Such is the case here.

## IV.   Analysis.

### A.   Breach of Contract Claim (Count One).

In Count One of the Second Amended Complaint, TMS brings a claim against Paymap for breach of contract.  As noted, it is undisputed that there is no direct contractual relationship between TMS and Paymap; however, Count One is predicated on the notion that "TMS is a third party beneficiary of the Paymap / LoanCare Agreement, as Diehl's loan service transferred from LoanCare to TMS, making TMS a transferee or subsequent servicer of the loan."  (Doc. 57, ¶ 36, PageID.244-45.)  Count One proceeds exclusively on a third-party beneficiary theory of liability, as TMS has conceded that "TMS is not seeking to enforce the Agreement as an assignee of LoanCare."  (Doc. 119, PageID.1511.)  According to TMS, Paymap breached the Agreement by not routing Diehl's mortgage payments properly in late 2015 and early 2016, in the manner required by the Agreement and the responsibilities designated in Schedule A(2)(c), such as "Process on-going debits from Subscriber accounts to the CHA" and "Process monthly mortgage payments from CHA to Client or a transferee designated by Client."

### 1.   TMS is Not a Third-Party Beneficiary of the Agreement.

The threshold legal question for Count One is whether TMS qualifies as a third-party beneficiary of the Agreement.  Under Colorado law,[7] "a third-party beneficiary to a contract may generally sue to enforce its terms."  *Bewley v. Semler*, 432 P.3d 582, 587 (Colo. 2018).  Thus, "a person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract."  *Id.* (citation omitted).  "Such an intent to benefit a third party must be apparent from the construction of the contract in light of all surrounding

---

[7]     In briefing the contract claims, both sides have relied on Colorado law.  The reason is that Paragraph 13 of the Agreement provides that it will be governed by and construed in accordance with the laws of the State of Colorado.  The parties having acknowledged that Colorado law governs pursuant to Paragraph 13, and no objections having been raised, this Court will apply Colorado law to the contract issues presented.

circumstances, and the intent of the parties is the key inquiry when determining whether a nonsignatory is a third-party beneficiary entitled to enforce the agreement." *Schneider v. SRC Energy, Inc.*, 424 F. Supp.3d 1094, 1100-01 (D. Colo. 2019) (citation omitted). "While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both." *Id.* (citation omitted); *see also Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014) ("Under Colorado law, the parties to a contract must intend to create third-party beneficiaries, and the best evidence of their intent is the contract itself").

In debating its status as a third-party beneficiary *vel non*, TMS maintains that pursuant to the Agreement's terms, "[u]pon transfer of Diehl's loan, Paymap was to continue to collect her monthly mortgage payment and distribute the payments to TMS for TMS' benefit." (Doc. 111, PageID.1440; doc. 119, PageID.1509.) The trouble with this argument is that the Agreement contains no such provision. To be sure, TMS appears to be hanging its hat on Paragraph 11, which addresses the scenario of a transfer of subscriber accounts from LoanCare to another loan servicer. Contrary to TMS's third-party beneficiary theory, however, Paragraph 11 does <u>not</u> impose on Paymap a duty to distribute the subscriber's mortgage payments to the new servicer for that new servicer's benefit. Rather, what the plain language of Paragraph 11 says is that, upon transfer of the loan to a new servicer, "Client [LoanCare] shall assist Paymap in implementing a process to make payments ***through Client*** [LoanCare] to the transferee [TMS]." (Doc. 107-1, ¶ 11, PageID.778 (emphasis added).) The parties' intent to benefit TMS is far from clear from this contract term, which under Colorado law is the best evidence of their intent or lack thereof. Certainly, nothing in Paragraph 11 would obligate Paymap to continue collecting Diehl's mortgage payments and distribute them directly to TMS for TMS's benefit. In light of this unambiguous language in Paragraph 11, the Court cannot accept the fundamental premise of TMS's third-party beneficiary argument, which is that "[u]pon sale or transfer of a loan subject to the Agreement, the transferee (TMS in this case) directly received the same benefit as LoanCare under the terms of the Agreement." (Doc. 111, PageID.1441.) Simply put, Paragraph 11 contains no promise by Paymap to convey a subscriber's mortgage payments directly to the transferee upon sale or transfer of a loan subject to the Agreement.

In an attempt to bolster its argument, TMS cites the FAQ section of the EAP, which reassures subscribers that if their loan is sold, "[w]ith a minimum notice of 10 business days,

we'll make sure that your program is set up correctly with the new mortgage company information." (Doc. 109-3, PageID.1249.)  Perhaps this language, which is not part of the Agreement between Paymap and LoanCare, could be viewed in tandem with Paragraph 11 to show that <u>Diehl</u> was an intended third-party beneficiary of that Agreement.  However, it does not provide any clarity as to an intent by Paymap and LoanCare to bestow a direct benefit on a putative transferee such as TMS in the event of a transfer of the servicing of Diehl's loan.

      Likewise, TMS's attempt to establish itself as a third-party beneficiary by invoking "successors and assigns" language in Paragraph 6 (the indemnity clause) falls flat.  Specifically, TMS posits that it must be a third-party beneficiary because "it is clear that Paymap and LoanCare intended the terms of the Agreement to extend directly to non-parties by providing for indemnity to LoanCare's 'successors and assigns.'"  (Doc. 111, PageID.1440; doc. 119, PageID.1510.)  Here, TMS is talking out of both sides of its mouth.  Elsewhere in the very same brief, TMS disclaims any intent to qualify for indemnity under the "successors and assigns" language of Paragraph 6 of the Agreement.  Indeed, TMS insists that "TMS does not, and has not, alleged that it is an assignee of the Agreement. … [T]he basis for TMS's claims for indemnity, as well as breach of contract, is that TMS is a third-party beneficiary of the Agreement …. TMS has not asserted rights as an assignee."  (Doc. 119, PageID.1518.)  It is difficult to see how the "successors and assigns" language of Paragraph 6 might be probative of Paymap's and LoanCare's intent to bestow a direct benefit on transferees such as TMS when TMS acknowledges it lacks any status or rights under that language.[8]

---

[8]     At any rate, TMS could not credibly claim assignee status under the Agreement. By the clear terms of Paragraph 15, LoanCare "may not assign or otherwise transfer its rights and obligations under this Agreement without Paymap's prior written consent."  (Doc. 107-1, ¶ 15, PageID.778.)  There is no evidence that Paymap ever provided any such "prior written consent" for LoanCare to assign or transfer its rights to TMS, and TMS does not claim otherwise.  More broadly, Paragraph 15 is damaging to TMS's third-party beneficiary argument. Recall that TMS's position is that it is a third-party beneficiary to the Agreement because upon sale or transfer of the Diehl loan, "the transferee (TMS in this case) directly received the same benefit as LoanCare under the terms of the Agreement."  (Doc. 119, PageID.1510.)  However, the Agreement specifies in Paragraph 15 that LoanCare's rights under the Agreement (*i.e.*, the benefits it received) could not be assigned or transferred without Paymap's prior written consent, which was never given.  What clearer statement of the parties' intent vis a vis bestowing direct benefits on third parties could there be?  Stated differently, Paragraph 15 strongly supports the proposition that the parties to the Agreement only intended to provide direct benefits to third-
(Continued)

Certainly, TMS received some incidental benefit insofar as Diehl's mortgage payments collected by Paymap pursuant to the Agreement were ultimately to be conveyed to TMS.  But that is not the legal standard for third-party beneficiary status under Colorado law.  Many contracts benefit third parties; however, no duty is created unless the parties intended to bestow a benefit on that third party.  *See, e.g., Bayou Land Co. v. Talley*, 924 P.2d 136, 153 n.26 (Colo. 1996) ("In order to be a third party beneficiary of a contract, the parties to the contract must intend to bestow a benefit on the third party."); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1119 (10th Cir. 2001) ("The performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary …, no duty to him is created.") (citation and internal marks omitted).  Based on the record facts before it and the arguments presented by the parties, the Court determines that no reasonable finder of fact could conclude that Paymap and LoanCare intended to provide a direct, and not merely incidental, benefit to TMS.  Because TMS is not a third-party beneficiary to the Agreement, the breach of contract claim presented in Count One fails as a matter of law, and is properly dismissed.

### 2. *Paymap Did Not Breach the Agreement.*

Alternatively, Paymap persuasively argues that it would be entitled to summary judgment on Count One even if TMS were properly deemed a third-party beneficiary to the Agreement. According to the Second Amended Complaint, Paymap breached the Agreement "by failing to correctly route August 2015, September 2015, October 2015, November 2015, December 2015, January 2016, and April 2016 payments in accordance with the LoanCare's instructions to Paymap and in accordance with the contract between LoanCare and Paymap."  (Doc. 57, ¶ 37, PageID.245.)  Upon scrutiny of the record, however, the Court agrees with Paymap that there are no genuine issues of material fact and that Paymap did not breach the Agreement in this manner.

The analytical starting point is the language of the Agreement itself.  Under TMS's theory of relief in Count One, "Paymap breached the terms of the Agreement because after receiving notice of transfer of Diehl's loan to TMS, Paymap continued to send Diehl's monthly

---

party transferees as to which Paymap provided prior written consent, which tends to negate third-party beneficiary status for entities like TMS as to which no such prior written consent was given.  Paymap was the gatekeeper for third parties to step into LoanCare's shoes and enjoy the benefits of the Agreement.  There is zero evidence that Paymap ever opened that gate for TMS, or that LoanCare ever asked it to do so; therefore, the record lacks proof that the parties to the Agreement intended to benefit TMS.

payments to LoanCare, not TMS." (Doc. 119, PageID.1513.) This theory necessarily turns on Paragraph 11 of the Agreement, which prescribes the parties' respective rights and duties in the event of a transfer of a subscriber account. But examination of Paragraph 11 reveals no breach by Paymap, and confirms that any breach was by LoanCare. For starters, Paragraph 11 provides that if LoanCare wished to sell or transfer a loan that was subject to a Subscriber Contract, then LoanCare "shall notify Paymap of its intention to do so at least 15 days prior to the proposed transfer or sale and provide Paymap with the name of the transferee and other pertinent details …." (Doc. 107-1, ¶ 11, PageID.778.) There is no record evidence that LoanCare furnished any such direct notice to Paymap (in any form, much less the specific form of contractual notice required by Paragraph 14 of the Agreement) of the impending transfer of servicing of Diehl's loan to TMS. TMS has neither argued nor shown otherwise.[9] As such, LoanCare was in breach of Paragraph 11; therefore, whatever post-transfer duties might otherwise have been imposed on Paymap pursuant to Paragraph 11 never came into play because of the failure of LoanCare to meet the condition precedent of providing prior contractual notice to Paymap of the transfer.

Moreover, even if LoanCare had provided Paymap with all of the notice and information required by Paragraph 11, and even if it had done so in the form mandated by Paragraph 14 (which it did not), Count One would still fail as a matter of law because Paymap did not breach Paragraph 11. Again, upon receipt of proper notice by Paymap that LoanCare was selling or

---

[9]     To be sure, TMS argues at length in its briefs that Paymap possessed actual notice of the servicing transfer of Diehl's loan. The record supports that conclusion. After all, Diehl notified Paymap in August 2015 and again in September 2015 that servicing of her loan would be handled by TMS going forward, and provided Paymap with TMS's contact information. Furthermore, on February 1, 2016, Diehl, TMS and Paymap all participated in a conference call to discuss the fact that Diehl's current loan servicer (TMS) was not receiving certain mortgage payments that Paymap had withdrawn from Diehl's account as part of the EAP program. Clearly, then, Paymap was on notice of the servicing transfer. But so what? Paragraphs 11 and 14 set forth clear notification procedures and protocols that LoanCare was required to follow in the event of a servicing transfer. LoanCare did not follow them. TMS would apparently have this Court write those requirements of Paragraphs 11 and 14 out of the Agreement; however, it cites nothing in the Agreement or Colorado law that would authorize such action. Nor can this Court unilaterally revise the contractual notice provision to embrace other forms of notice (*i.e.*, notice from the subscriber herself, in this case Diehl) that the parties did not. The issue in Count One is not what Paymap knew or did not know. The issue is whether LoanCare complied with the specific notice provisions that would trigger contractual obligations for Paymap under Paragraph 11 for handling EAP payments in the wake of LoanCare's sale or transfer of a loan. On this record, it is clear that LoanCare did not.

transferring a subscriber's loan, the Agreement specifies that "[LoanCare] shall assist Paymap in implementing *a process to make payments through [LoanCare] to the transferee [TMS]*." (Doc. 107-1, ¶ 11, PageID.778 (emphasis added).)  This contract language is unambiguous in stating that Paymap's responsibility in the wake of a Paragraph 11 transfer was to make payments through LoanCare to TMS.  Nothing in Paragraph 11 would obligate Paymap to make payments directly to TMS; indeed, the opposite is true.  Yet plaintiff's entire theory of liability in Count One is that "Paymap breached the terms of the Agreement because … Paymap continued to send Diehl's monthly payments to LoanCare, not TMS."  (Doc. 119, PageID.1513.)  That conduct is no breach of the Agreement at all; to the contrary, it amounts to strict compliance with the letter of Paragraph 11.[10]  Because Paymap's actions in routing Diehl's loan payments to LoanCare, rather than to TMS, after the servicing transfer of Diehl's loan did not violate any terms of the Agreement, TMS's breach of contract claim in Count One of the Second Amended Complaint would fail as a matter of law even if TMS were a third-party beneficiary of the Agreement.  Defendant is entitled to summary judgment on Count One.

---

[10]   In arguing that Paymap did violate the Agreement by continuing to send Diehl's mortgage payments to LoanCare after the transfer, TMS does not offer any alternative reading or interpretation of the actual Agreement language (Paragraph 11 or otherwise) under which it might prevail.  Instead, TMS reasons that it would be "illogical" to deem Paymap not in breach for sending the payments to LoanCare instead of to TMS.  (Doc. 123, PageID.1555.)  According to TMS, this is so because Paymap asked for contact information for the transferee, and Paymap owed certain contractual duties to Diehl to send payment to the correct loan servicer.  In essence, TMS is asking this Court to use parol evidence to modify the terms of an unambiguous provision in the Agreement.  Colorado law does not countenance such a maneuver.  *See, e.g., Boyer v. Karakehian*, 915 P.2d 1295, 1299 (Colo. 1996) ("In the absence of allegations of fraud, accident, or mistake in the formation of the contract, parol evidence may not be admitted to add to, subtract from, vary, contradict, change, or modify an unambiguous integrated contract."); *Denver Classroom Teachers Ass'n v. School District No. 1*, 434 P.3d 680, 684 (Colo.App. 2017) ("If a contract is unambiguous, it cannot be changed by extrinsic evidence.").  The Agreement says what it says, and does so unambiguously.  "It is axiomatic that in construing a document courts should not rewrite the provisions of an unambiguous document, but must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms."  *USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997).  Whether plaintiff, this Court, or anyone else perceives that a party's behavior seems "illogical" when compared to unambiguous contractual language is of no consequence.

B.    *Money Had and Received Claim (Count Four).*

In Count Four of the Second Amended Complaint, TMS brings a claim against Paymap for money had and received. Plaintiff's pleading posits that because Paymap sent Diehl's mortgage payments to LoanCare rather than to TMS, "there is money had and received that was not properly credited to Diehl's account, as it would have been if the said payments had been sent to TMS." (Doc. 57, ¶ 47, PageID.247.)

Under Colorado law (which both sides agree governs all of TMS's claims, not just those arising directly under the Agreement), a claim for "money had and received" vindicates the notion that "a party will not be allowed to keep money which in equity and good conscience should be returned to another." *Mullens v. Hansel-Henderson*, 65 P.3d 992, 999 (Colo. 2002). Thus, "[a] plaintiff can maintain an action for money had and received whenever the defendant has received money which, in equity and good conscience, he ought to pay over." *Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 857 (Colo. App. 2003) (citation and internal quotation marks omitted). The cause of action for money had and received "is founded on the principle that no one ought to be unjustly enriched at the expense of another." *In re B & L Oil Co.*, 46 B.R. 731, 736 (Bankr. D. Colo. 1985); *see also Mullens*, 65 P.3d at 999 ("'Money had and received,' like quantum meruit, exists to prevent unjust enrichment."). This claim "is flexible in nature and is not restricted by technical rules." *B & L Oil*, 46 B.R. at 736.

In summary judgment briefing, Paymap persuasively argues that the circumstances surrounding Paymap's processing and distribution of Diehl's mortgage payments simply cannot sustain a viable claim for money had and received. Multiple specific facts and circumstances support that conclusion. First, the undisputed record evidence shows that Paymap has already "paid over" every dollar to which TMS claims entitlement. In other words, Paymap did not retain any of the subject funds collected from Diehl's account.[11] Thus, Paymap holds no money that in equity and good conscience should be returned to TMS.

---

[11]     TMS contests this point, arguing, "Paymap alleges that it did not retain any funds belonging to TMS, but TMS has shown that Paymap did retain funds." (Doc. 119, PageID.1516.) TMS has shown no such thing. Indeed, the record citations on which TMS relies reinforce the uncontroverted fact that Paymap did not hold onto any funds received from Diehl's account, but instead either paid them out to LoanCare or refunded them to Diehl, or in some cases did both. (Doc. 109-9, PageID.1357; doc. 109-3, PageID.1163.) TMS's theory of liability in Count Four is that Paymap paid over those funds to the wrong entity by sending Diehl's
(Continued)

Second, insofar as TMS's theory underlying Count Four is that Paymap paid over the subject monies to the wrong entity (*i.e.*, to LoanCare rather than to TMS), the record unambiguously shows that Paymap distributed the funds to the contractually required entity in the contractually required manner. As discussed in section IV.A.2., *supra*, the Agreement between Paymap and LoanCare provided that if LoanCare transferred Diehl's loan and properly notified Paymap, then Paymap would continue collecting Diehl's funds and make payments through LoanCare to TMS. That is precisely what Paymap did by continuing to distribute Diehl's mortgage payments to LoanCare. As such, far from paying the wrong entity, the undisputed record evidence confirms that Paymap paid the funds at issue to the proper entity as established by the terms of the Agreement.[12]

Third, and more broadly, recall that money had and received is an equitable remedy. The test is whether Paymap has received money that, in equity and good conscience, it ought to pay

_____

mortgage payments to LoanCare (and/or refunding the money to Diehl), rather than sending the money to TMS. But TMS fails to identify any authority under Colorado law (or the law of any other jurisdiction) supporting the proposition that a claim of "money had and received" – which is rooted in principle of unjust enrichment – may lie against a defendant that is accused not of wrongfully holding or retaining funds, but of paying them out to the wrong entity. Nor does TMS further its cause by characterizing as "irrelevant" the facts establishing that Paymap did not retain the subject funds. (Doc. 123, PageID.1557.) Money had and received is an equitable cause of action that lies only when equity and good conscience dictate that money received by the defendant should be paid over. It defies logic to contend that the defendant's ultimate disposition of those funds (and specifically whether the defendant retained the money) cannot properly factor into that "equity and good conscience" analysis along with all other facts and circumstances. At any rate, TMS cites no supporting authority for that proposition. The same reasoning defeats TMS's formalistic argument that "the elements TMS must prove do not require a showing that Paymap held on to the money." (*Id.*) Again, what TMS must prove is that considerations of "equity and good conscience" warrant requiring Paymap to pay over the moneys received. The fact that Paymap already, promptly paid over the funds to a different entity weighs heavily against TMS's ability to make the necessary showing of proof that "equity and good conscience" favor directing Paymap to disgorge those same funds (which it no longer holds and did not deplete for its own benefit) to TMS.

   [12]   In contesting this point, TMS maintains that "[i]t is undisputed that under the terms of the Agreement, Paymap was to collect funds from Diehl and distribute them to TMS." (Doc. 111, PageID.1445.) This argument runs directly counter to the record evidence. Nowhere in the Agreement did Paymap ever promise to make payments <u>directly</u> to TMS. None of TMS's citations to the Agreement reflect otherwise. The Court cannot and will not rewrite the terms of the Agreement to impose on Paymap contractual obligations that it did not have.

over to TMS.  Considering the totality of material circumstances set forth in the record, none of which are disputed, the Court finds that principles of equity and good conscience do not warrant entry of judgment requiring Paymap to pay those funds over to TMS.  Paymap has not been unjustly enriched.  It has paid out all of Diehl's mortgage payments, in some cases doubly so by both forwarding the funds to LoanCare and refunding Diehl directly.  Paymap performed as required by its contract with LoanCare.  There is no evidence that Paymap controlled what LoanCare did or did not do with Diehl's mortgage payments, much less what Diehl did with the mortgage payments it refunded to her.  If Paymap could not force LoanCare or Diehl to pass those funds along to TMS (and there is no evidence that it could), then it is not Paymap's fault that LoanCare and Diehl failed to do so.  Also, LoanCare never furnished proper contractual notice to Paymap of the transfer of servicing Diehl's loan to TMS.  While the record shows that Paymap was otherwise put on notice of the servicing transfer to TMS, that fact alone does not render it equitable to order Paymap to pay over the subject monies to TMS.

For all of these reasons, the Court concludes that there are no genuine issues of material fact, and that defendant is entitled to entry of judgment as a matter of law on Count Four, the claim for money had and received.  Simply put, TMS has failed to show that that Paymap has received money which, in equity and good conscience, it ought to pay over to TMS at this time.

## C.    Failure to Indemnify (Count Five).

Count Five of the Second Amended Complaint sets forth TMS's claim for contractual indemnity against Paymap.  This claim is rooted in Paragraph 6(b) of the Agreement between Paymap and LoanCare, which provides as follows: "Paymap agrees to indemnify and hold harmless [LoanCare] and its agents, employees, officers, directors, affiliates, subsidiaries, successors and assigns from and against *all third party claims resulting solely from Paymap's breach of this Agreement.*"  (Doc. 107-1, ¶ 6(b), PageID.777 (emphasis added).)  During summary judgment briefing, TMS unambiguously staked itself to the position that "the basis for TMS's claims for indemnity, as well as breach of contract, is that TMS is a third-party beneficiary of the Agreement and therefore entitled to enforce the Agreement against Paymap …. TMS has not asserted rights as an assignee."  (Doc. 119, PageID.1517-18; doc. 123, PageID.1557-58.)

Given the contours of Count Five, the undersigned readily concludes that it fails as a matter of law for several independent reasons.  As an initial matter, the Court has already

analyzed TMS's third-party beneficiary theory in Section IV.A.1., *supra*, and has determined that no reasonable finder of fact could conclude on this record that TMS was a third-party beneficiary of the Agreement.  That finding not only defeats Count One, but is also fatal to Count Five as postured by TMS, given its representations that it is proceeding exclusively on the very same third-party beneficiary theory as to Count Five that is underpinning Count One.  As Count One falls short on that basis, so too does Count Five.

Besides, even if TMS could qualify as an intended third-party beneficiary of the Paymap / LoanCare Agreement, clear contract language would bar TMS from successfully asserting contractual indemnity rights here.  By the express terms of Paragraph 6(a), LoanCare (and hence TMS, as putative third-party beneficiary) has a contractual right to indemnity only for "third party claims resulting solely from Paymap's breach of this Agreement."  In Section IV.A.2., *supra*, the Court has previously explained that on this record no reasonable fact finder could conclude that Paymap breached the Agreement by sending Diehl's mortgage payments to LoanCare, rather than to TMS, because Paragraph 11 contemplated that in the event of a loan transfer, Paymap would continue making payments through LoanCare, which is precisely what it did.  Also, LoanCare's undisputed failure to provide the contractually required notice of the transfer to Paymap at the contractually required time in the contractually required form, as required by Paragraphs 11 and 14, means that Paymap could not have been in breach even if Paragraph 11 would otherwise have obligated it to route Diehl's payments directly to the transferee, which it did not.  Of course, absent a breach of the Agreement by Paymap, there could be no indemnity obligations running from Paymap to TMS even if TMS were a third-party beneficiary.

Yet another insuperable defect with Count Five is that the indemnity provision found at Paragraph 6(b) is triggered only for third-party claims resulting <u>solely</u> from Paymap's breach.  Whatever else may or may not be said, Diehl's claims against TMS in the *Money Source* Action did not result solely from a breach of the Agreement by Paymap.  This is so even if Paymap could be found on this record to be in breach of the Agreement.  That is to say, the myriad snafus and errors surrounding the failure of Diehl's mortgage payments to reach the new servicer of her loan, the failure of Diehl/TMS/LoanCare/Paymap to resolve the issue, and TMS's decision to aggressively pursue collection activities against Diehl were multi-faceted events that resulted from acts, errors and omissions by multiple persons and entities.  Diehl's claims in the *Money*

*Source* Action flowed from all of those events, not just Paymap's alleged breach.  Thus, any reasonable reading of Diehl's Complaint against TMS in the *Money Source* Action confirms that Diehl's claims (and that litigation) did not result "solely" from Paymap breaching the Agreement.[13]

For all of these reasons, the Court finds that there are no genuine issues of material fact and that Paymap is entitled to judgment as a matter of law on Count Five, alleging a claim against Paymap for contractual indemnity based on Diehl's claims against TMS and LoanCare in the *Money Source* Action.

### D.    Unjust Enrichment (Count Six).

Count Six of TMS's Second Amended Complaint sets forth a claim against Paymap pursuant to the doctrine of unjust enrichment.  As pleaded, this claim flows from TMS's contention that "Paymap's misrouting of Diehl's … [mortgage] payments unjustly enriches Paymap by way of receiving any fees or monetary compensation for the processing of Diehl's

---

[13]     For example, a sizeable chunk of Diehl's complaint in the *Money Source* Action pursued relief against TMS for "engag[ing] in an aggressive collections campaign against [Diehl] which includes harassing phone calls, numerous demands for sums not owed, repeated written express threats of imminent foreclosure, false credit reporting and the unlawful contacts with [Diehl]'s ex-husband all in an attempt to coerce [Diehl] to pay sums she does not owe. … In addition, TMS failed to comply with the [RESPA] … which required a reasonable investigation of Plaintiff's Notice of Servicing Error …. TMS failed to conduct such investigation, failed to properly respond to the NOE and failed to take required corrective action.  TMS also failed to conduct proper investigation and make corrections to its credit reporting in response to Plaintiff's credit reporting dispute as required by the [FCRA]."  (Case No. 1:17-cv-00125 doc. 1, at 1-2, PageID.1-2; *see also* Case No. 1:17-cv-00125 doc.58, at 1-2, PageID.344-45.)  Under any fair reading of the pleadings, Diehl's claims against TMS in the *Money Source* Action were directed in principal part at alleged unlawful, improper, wanton and reckless activities undertaken by TMS (and having nothing whatsoever to do with Paymap) relating to TMS's allegedly harassing collection activities against Diehl, as well as TMS's decision to declare her loan in default even though it knew or should have known she had made every single required mortgage payment through the EAP in a timely manner.  This litany of alleged wrongful acts and omissions by TMS lying at the core of the *Money Source* Action conclusively refutes any suggestion that Diehl's claims against TMS in that lawsuit "result[ed] solely from Paymap's breach of this Agreement," so as to implicate Paymap's contractual indemnity obligations under Paragraph 6(b), even if TMS were a third-party beneficiary to the Agreement (which it was not), even if Paymap were in breach of the Agreement (which it was not), and even if LoanCare had provided Paymap with proper notice of the transfer of servicing of Diehl's loan (which it did not).  Simply put, Diehl sued TMS for things TMS allegedly did wrong, not for things Paymap allegedly did wrong.  Accordingly, Paragraph 6(b)'s indemnity provision is not and cannot be in play.

said monthly payments, unjustly enriching Paymap at the expense of TMS." (Doc. 57, ¶ 58, PageID.249.)

The parties agree that Colorado law governs Count Six. Of course, it is well settled that "[u]njust enrichment is a quasi-contractual, equitable remedy designed to undo a benefit conferred on one party at the unfair expense of another party." *Scott v. Scott*, 428 P.3d 626, 636 (Colo. App. 2018) (citation omitted). Thus, under Colorado law, "a party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (citation omitted); *see also DTC Energy Group, Inc. v. Hirschfeld*, 420 F. Supp.3d 1163, 178 (D. Colo. 2019); *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp.3d 1224, 1261 (D. Colo. 2014) ("In short, under Colorado law, a plaintiff must allege that at the plaintiff's expense, defendants received a benefit under circumstances that would make it unjust for defendants not to make restitution.") (citations omitted).

On this record, TMS's unjust enrichment cause of action fails to satisfy any of the legally required elements, much less all of them. As to the element that Paymap "received a benefit," the obvious defect in Count Six is that Paymap was merely a conduit, a pass-through for Diehl's mortgage payments. It did not pocket those funds; to the contrary, uncontroverted record evidence confirms that Paymap either forwarded Diehl's challenged mortgage payments to LoanCare, or refunded those sums to Diehl, or (in some cases) did both. Diehl's monthly payments themselves can in no way be reasonably regarded as constituting a "benefit" received by Paymap for purposes of establishing liability on an unjust enrichment theory under Colorado law. Perhaps in recognition of the inevitability of such a conclusion, TMS suggests in its pleadings and briefs that the "benefit" received by Paymap for Count Six purposes was the processing fees paid to Paymap by LoanCare and/or Diehl for handling Diehl's account under the EAP. (Doc. 111, at 29, PageID.1447 ("The benefit received by Paymap, at the very least, was the fees received by Paymap under the Agreement.").)

The trouble with TMS's efforts to classify processing fees paid to Paymap for the Diehl account as the "benefit" by which Paymap was unjustly enriched is that doing so would run headlong into the second element, namely, the requirement that the subject "benefit" be at TMS's expense. Simply put, there is no reasonable argument that the EAP subscriber processing

-19-

fees paid to Paymap were at TMS's expense.  TMS did not pay those processing fees to Paymap; rather, they were paid exclusively by Diehl and/or LoanCare.  Nor is there even a hint of a suggestion in the record that Paymap was paid more or differently for routing Diehl's payments to LoanCare than it would have been paid for routing Diehl's payments to TMS.  Likewise, there is no indication in the record that the effort and activity required of Paymap to process Diehl's mortgage payments was any less if her payments were distributed to LoanCare than it would have been if her payments had been distributed to TMS.  And there is no evidence and no reason to believe that Paymap failed to process Diehl's mortgage payments (*i.e.*, that it did not do the work for which the fees were intended to compensate it).  Putting all of these points together, then, the EAP processing fees that Paymap received for Diehl's account cannot reasonably be deemed to be a benefit received <u>at TMS's expense</u> because (i) those processing fees were not diverted or withheld from TMS, (ii) those processing fees were not paid by TMS, (iii) there is no evidence that those processing fees were increased even one penny by Paymap routing Diehl's payments to LoanCare instead of to TMS, and (iv) there is no evidence that Paymap did any less work to earn those processing fees by distributing Diehl's mortgage payments to LoanCare rather than to TMS.  Thus, Count Six fails as a matter of law for lack of any showing from which a reasonable fact finder could conclude that Paymap received a benefit at TMS's expense.[14]

Even if TMS could somehow meet the first and second requirements of an unjust enrichment claim under Colorado law, Count Six would nonetheless fail as to the third element, which is that the benefit in question must be received "under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."  *Lewis*, 189 P.3d at 1141.  No such circumstances exist here.  Indeed, it would not be just or equitable to

---

[14]    To summarize, the fundamental defect with TMS's attempt to pursue an unjust enrichment remedy is this:  Insofar as TMS would classify the benefit received by Paymap to be Diehl's mortgage payments (which were "at TMS's expense"), the claim fails because those payments were not a benefit to Paymap, which forwarded them all to LoanCare and/or refunded them to Diehl.  Thus, if Count Six is analyzed with respect to Diehl's mortgage payments, the analysis flunks the first element for an unjust enrichment claim under Colorado law.  Insofar as TMS would classify the benefit received by Paymap to be the EAP processing fees for handling Diehl's payments, TMS might satisfy the first element, but then falls well short as to the second element.  That is because those processing fees were in no way a benefit to Paymap <u>at TMS's expense</u>.  As such, plaintiff has no means of satisfying both the first and second elements of an unjust enrichment claim under Colorado law as to any particular "benefit."

require Paymap to compensate TMS for Diehl's mortgage payments which Paymap did not retain, does not hold, and in some instances has already paid out twofold (once to LoanCare and once to Diehl). The equities of the situation disfavoring TMS are compounded by the fact that Paymap paid out the Diehl funds in accordance with the terms of the Agreement and without ever receiving contractually proper notice from LoanCare about the servicing transfer of Diehl's loan. Likewise, it would not be just or equitable to require Paymap to disgorge its processing fees from the Diehl mortgage payments to TMS. Paymap earned those processing fees. TMS has no colorable claim to be entitled to those fees, much less any reasonable argument that it is unfair or unjust for Paymap to retain the Diehl processing fees for work that Paymap undisputedly performed in processing Diehl's account under the EAP program.

For all of the foregoing reasons, the Court concludes as a matter of law that Paymap has not been unjustly enriched at TMS's expense as to either Diehl's mortgage payments that were routed to LoanCare or as to the processing fees paid to Paymap under the terms of the Agreement between LoanCare and Paymap. As such, defendant is entitled to summary judgment on Count Six of the Amended Complaint.

## V.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Plaintiff's Motion for Summary Judgment (doc. 108) is **denied** in its entirety;

2. Defendant's Motion for Summary Judgment (doc. 110) is **granted** in its entirety because there are no genuine issues of material fact, and defendant is entitled to entry of judgment as a matter of law;

3. Plaintiff's Motion to Strike (doc. 117) is **moot**;

4. This action is **dismissed with prejudice**; and

5. A separate Judgment will enter.

DONE and ORDERED this 19th day of June, 2020.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE